[S. F. No. 17534.   In Bank.   Apr. 3, 1948.]

CHARLES H. EISLEY et al., Petitioners, v. LOU P. MOHAN, as County Assessor, etc., Respondent.

John A. Sinclair and Warren H. Atherton for Petitioners.

J. R. Klawans and Orville Pratt, as Amici Curiae on behalf of Petitioners.

Fred N. Howser, Attorney General, James E. Sabine, E. G. Benard, Deputy Attorneys General, Clarence E. Tindall, District Attorney (Placer County), and Frederick L. Felton, County Counsel (San Joaquin County), for Respondent.

EDMONDS, J.—Charles H. Eisley and the Department of Veterans Affairs of this state joined as petitioners in an original proceeding, commenced in this court, to obtain a writ of mandate directed to the assessor of Placer County. The purpose of the litigation is to compel the respondent to assess to Eisley his possessory interest in real property purchased by him from the Veterans Welfare Board, the predecessor of the Department of Veterans Affairs.

The petition alleges the following facts: In 1930, Eisley purchased the property, consisting of a house and lot which he has since occupied, from the Veterans Welfare Board under a contract authorized by the Farm and Home Purchase Act enacted in 1921. (Stats. 1921, ch. 519, p. 815; now incorporated in Mil. & Vet. Code, § 800 et seq.) This contract provides for the payment of the purchase price in monthly installments over a period of 20 years. From 1921 to 1946, inclusive, it was the practice of the taxing authorities of the state to tax veterans upon the value of their right of pos-

session. In March, 1947, the respondent, for the first time, assessed the property to Eisley at a cash value of $2,100, and declared that he intended to place it upon the secured tax roll. This change of policy was pursuant to an opinion by the attorney general.

Following this action and declaration of policy, the petition continues, Eisley demanded that the possessory interest in the property be assessed upon the unsecured roll in the amount of $1,785, being 85 per cent of its full cash value. He is entitled to a veteran's exemption of $1,000, and he tendered to the respondent $23.63, being the amount of the taxes due upon an assessment of $785 at the tax rate fixed for the year 1946-47. The respondent refused these demands and the tender and entered the property, assessed to Eisley, upon the secured tax roll.

Other allegations of the petition are that there is no plain, speedy, or adequate remedy in the ordinary course of law whereby the rights of the petitioners can be upheld, because if the assessment is not removed it will " . . . become delinquent, penalties will attach and a cloud will be created upon the title. . . . " Furthermore, the refusal of the respondent and the other county assessors to assess to veterans only their possessory interest in property purchased from the Department of Veterans Affairs is interfering with the sale of property by that agency of the state.

Petitioners contend that mandamus is the appropriate remedy "to galvanize recalcitrant county officials who refuse to compute tax assessments pursuant to law"; and as to the merits, that the property "belongs to" the state, within the meaning of article XIII, section 1, of the Constitution of California which exempts public property from taxation. Reliance is also placed upon the decision in *State Land Settlement Board* v. *Henderson,* 197 Cal. 470 [241 P. 560], as a rule of property which, it is said, has been followed for 25 years and should be continued as authority under the doctrine of *stare decisis.* It is vigorously asserted that the Constitution forbids the assessment here challenged and exempts from taxation property to which the government holds title not only as security but also to insure the execution and success of a public project or policy, such as land grants. The Veterans' Home Purchase Program in California, the argument concludes, is similar in structure and purpose to the governmental purpose of land grants, and the state agency

holds the legal title to property sold by the Department of Veterans Affairs, not merely for security, but to enforce and guide the vast public project.

By way of return to the alternative writ issued upon this petition, the respondent demurred, asserting that the facts alleged do not state a cause of action. Considering the merits of the question of law as to the proper assessment basis for real property being purchased under a contract of conditional sale, the attorney general insists that as the veteran is the equitable owner of the property, it is assessable to him at its full value.

At the time of oral argument, the procedural question was raised as to the petitioners' right to the remedy of mandamus for the purpose of preventing the taxation of property and the parties have presented supplemental briefs upon that point. The petitioners claim that mandamus is an appropriate remedy because article XIII, section 15, is not a bar to mandatory relief since the legal remedies are inadequate, and there is a certainty of multiplicity of suits; the writ sought does not involve "collection" of taxes, but is only directed at the illegal assessment of taxes; and the provision does not apply to counties or to county officers. The attorney general, on behalf of the assessor, also justifies the procedure upon the ground that the prohibition in the Constitution is as to suits against the state or its officers, while in the present case the remedy of mandamus is sought against a county officer.

Section 15, article XIII, of the California Constitution provides: "No injunction or writ of mandate or other legal or equitable process shall ever issue in any suit, action or proceeding in any court against this State, or any officer thereof, to prevent or enjoin the collection of any tax levied under the provisions of this article; but after payment thereof action may be maintained to recover, with interest, in such manner as may be provided by law, any tax claimed to have been illegally collected."

This provision, based on section 14 [g], article XIII, adopted in 1910, has not before been construed by an appellate court of California. The petitioners rely upon decisions in other jurisdictions interpreting statutory provisions substantially identical with that of our Constitution. Generally speaking, these cases hold that such a statute may not be construed as depriving the courts of the powers conferred upon them by the state Constitution. Such statutes, it is said, are declaratory of the rule that the collection of a tax will not be re-

strained upon the ground of illegality alone; extraordinary and exceptional circumstances must be shown before relief by prerogative writ will be granted. (Note 108 A.L.R. 184.) It also has been held that a federal statute (53 Stats. 446, 26 U.S.C.A. § 3653[a]), which provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court," is merely declaratory of the rule that a court of equity will not restrain the collection of a tax upon the sole ground of its illegality, but relief will be given where the remedy at law is inadequate. (*Miller* v. *Standard Nut Margarine Co.*, 284 U.S. 498 [52 S.Ct. 260, 76 L.Ed. 422]; *Hill* v. *Wallace,* 259 U.S. 44 [42 S.Ct. 453, 66 L.Ed. 822]; *Lee* v. *Bickell,* 292 U.S. 415 [54 S.Ct. 727, 78 L.Ed. 1337]; *Atlantic Coast Line R. Co.* v. *Daughton, Commissioner,* 262 U.S. 413 [43 S.Ct. 620, 67 L.Ed. 1051]; *Wallace* v. *Hines,* 253 U.S. 66 [40 S.Ct. 435, 64 L.Ed. 782]; *Union Pacific R.R. Co.* v. *Board of Com'rs. of Weld County,* 247 U.S. 282 [38 S.Ct. 510, 62 L.Ed. 1110]; *Stewart Dry Goods Co.* v. *Lewis,* 287 U.S. 9 [53 S.Ct. 68, 77 L.Ed. 135]; *Dows* v. *Chicago,* 11 Wall. 108 [20 L.Ed. 65].)

The provision of the California Constitution is much more than a mere declaration of the rules generally applicable in proceedings for injunction, mandamus, or other legal or equitable relief. However, the section applies only to an action against the state or an officer thereof with respect to his duties in assessing or collecting a state. tax for state purposes. ■ A county assessor and a member of a county board of equalization is a county officer. (Const., art XI, § 7½; Pol. Code, § 4013[9] and [14].) Under some circumstances, he may perform certain tax functions for a city, and also for the state, but when he either assesses or collects taxes for county purposes, he is the agent of the county. (*Los Angeles County* v. *Superior Court,* 17 Cal.2d 707, 714-717 [112 P.2d 10].) The taxes which occasioned the present controversy were assessed for local purposes; the state neither assesses nor collects ad valorem real property taxes. (Art. XI, §§ 12 and 13; see *Tulare County* v. *May,* 118 Cal. 303, 308-309 [50 P. 427]; *Banaz* v. *Smith,* 133 Cal. 102, 103 [65 P. 309]; *Los Angeles County* v. *Superior Court, supra* at 712; Peppin, *Municipal Home Rule in California,* 34 Cal.L.Rev. 644, 676-690.)

■ Prior to 1933, the constitutional provision in question concerned taxes levied under sections 14 and 15 of article

XIII. Each of these sections, as then in effect, authorized the levy of certain taxes by state officers for state purposes. (See *Arnold* v. *Hopkins,* 203 Cal. 553, 558 [265 P. 223].) In 1933, article XIII was amended with respect to the assessment by the state of property of public utilities (§ 14), and also in regard to the taxation of the franchises of banks and other corporations (§ 16.) Also, the new provision, to some extent, shifted the burden of school support from the counties to the state. (§ 15; see *Crow* v. *Board of Supervisors,* 135 Cal.App. 451, 461-462 [27 P.2d 655].) The provisions with respect to injunction, previously stated in sections 14 and 15, were modified to include a writ of mandate and were made applicable to taxes levied under article XIII. But in the light of the context and historical background, the substitution of the word "article" for "section" is not a sufficient basis for construing the constitutional prohibition in its amended form as applicable to counties and county officers. Section 15 of article XIII does not, therefore, preclude the issuance of the writ in this case.

■ Article XIII, section 1, of the California Constitution provides that all property shall be taxed in proportion to its value except that "such as may belong to this State . . . shall be exempt from taxation." The underlying theory supporting tax exemption of public property is that the object of taxation is revenue and none would result from taxation by the state of property which it owns. Under such circumstances, the collection of taxes "would be merely taking money out of one pocket and putting it into another." (*People* v. *Doe,* 36 Cal. 220, 222; *People* v. *McCreery,* 34 Cal. 432, 433.) The exemption provided in section 1 of article XIII is a declaration of this fundamental principle.

■ In determining the scope of the constitutional exemption, ownership is the decisive factor and "it has been held or assumed in many instances that property sold under executory contract by a state or a political subdivision thereof was subject to assessment for taxes in the hands of the vendee." (Anno., Taxation—Property of Exempt Vendor, 166 A.L.R. 595, 613, and see cases collected under heading III, Property of state or political subdivision. [a]. Taxability generally.) ■ Generally speaking, land which has been sold to an individual by the federal government, or by a state, loses its tax exempt status although the government may retain the legal title as security for the payment of a part of the purchase price. (*S.R.A., Inc.* v. *Minnesota,* 327

U.S. 558, 569 [66 S.Ct. 749, 90 L.Ed. 851]; *Irwin* v. *Wright*, 258 U.S. 219, 229 [42 S.Ct. 293, 66 L.Ed. 573].) The form of the transfer is immaterial; the determinative question is whether private rights have supplanted those of the government insofar as the use of the property is concerned. "Where beneficial interest has passed to a vendee, the retention of legal title does not give a significant difference from the situation of a deed with a lien retained or a mortgage back to secure the purchase money." (*S.R.A., Inc.* v. *Minnesota, supra,* p. 569.)

The exemption of state owned property is given by section 1 of article XIII which declares that "[a]ll property . . . except as otherwise in this Constitution provided, . . . shall be taxed in proportion to its value," but further provides that "a mortgage, deed of trust, contract, or other obligation by which a debt is secured when land is pledged as security for the payment thereof, together with the money represented by such debt, shall not be considered property subject to taxation." For tax purposes, then, the security title is not considered to be property, and it necessarily follows that the "vendee . . . [in] possession of the land under an executory contract, is for all purposes the owner and the vendor retains mere legal title." (*Elliott* v. *McCombs,* 17 Cal.2d 23, 31 [109 P.2d 329].)

The plan whereby veterans may purchase homes from the state rests upon constitutional provisions approved at the general election in 1922. The argument presented to the voters in support of the proposed amendment, and the issuance of bonds to carry out its purposes, includes the following statement: "The title to the property will remain in the state as security until the purchase price has been paid in full." By later legislation the taxability of property sold to veterans in conformity with the authority granted by the people was clearly recognized. In 1923, the Legislature amended the Veterans Farm and Home Purchase Act and authorized the board to pay taxes and assessments which the purchaser fails or neglects to satisfy. Any amount paid by the board may be added to the selling price of the property. (Stats. 1923, ch. 405, § 7, pp. 915-916; now incorporated in Mil. & Vet. Code, § 823.) Obviously the purpose of these provisions is to allow the board to protect land sold by it from sales for delinquent taxes while it is subject to an executory contract of sale.

By a recent decision, the United States Supreme Court held that a state may tax real property sold by the United States

to an individual under an executory contract. (*S.R.A., Inc.* v. *Minnesota*, 327 U.S. 558 [66 S.Ct. 749, 90 L.Ed. 851].) The rationale of the holding is that, under such circumstances, the retention of legal title by the federal government is for security purposes only and does not exempt such property from taxation. The purchaser from the government sought exemption from tax liability under the authority of the ''land grant'' cases, but the court refused to follow them. In reaching its conclusion, the court pointed out that the decision in *Irwin* v. *Wright,* 258 U.S. 219 [42 S.Ct. 293, 66 L.Ed. 573], concerned the taxation of land held by an entryman under the Reclamation and Homestead Acts who had not received his final certificate of land clearance. ''The reason for the rule against state taxation until the equitable title passes from the United States to the entryman was there placed upon the policy of the Government to require those who sought government land to perform the required conditions of residence or improvement before beneficial title, subject to state taxation, passes from the United States to the locator. This transfer was said not to take place until the certificate was issued . . . The prohibition of state taxation until the certificate was issued was one of the means by which the Government furthered its public policy of land settlement. After compliance with the condition and before the patent, the state could tax.'' (*S.R.A., Inc.* v. *Minnesota, supra.*)

The primary purpose of the Veterans' Farm and Home Purchase Act is to finance the purchase of farms and homes for veterans. Under the terms of the statute and contract with Eisley, equitable title and right to possession passed to him when he entered into the conditional sale transaction. (Mil. & Vet. Code, §§ 821-830; cf., §§ 987.1-987.10.) The basic procedure is quite different from that of the statutes permitting entry on public lands. It is not the social policy of the federal government in disposing of the public land which precludes a state from taxing real property acquired by an entryman under a land grant statute. The controlling factor is the status of the title, and upon the vesting of the equitable title, the land may be taxed to the entryman.

In the few jurisdictions in which the question has arisen since the decision of the S.R.A. case, the state courts have followed its reasoning and held that the vendee in possession under an executory contract of sale is liable as the owner for the taxes. (*Ken Realty Co., Inc.,* v. *State,* 247 Ala. 610 [25

So.2d 675]; *Bancroft Inv. Corp.* v. *City of Jacksonville,* 157 Fla. 546 [27 So.2d 162]; *Norbet Corp.* v. *City of Newark,* 135 N.J.L. 314 [51 A.2d 541].) The Ken Realty Co. case antedates the S.R.A. decision. An application for rehearing, considered after the S.R.A. decision, was denied, the court referring to the S.R.A. case and stating that its "decision is in accord with the principles therein stated." (25 So.2d 679.)

Originally the Florida Supreme Court held that property sold to a private purchaser under an executory contract from the United States is immune from state taxation under federal law and is also exempt from taxation under the state statutes. Upon a rehearing, after the decision in the S.R.A. case, the court receded from this position, stating that a review of the question, in the light of the S.R.A. case, leads to a conclusion that the vendee is the owner of the taxable interest in the property, "that the United States has abandoned such use of it as gave it an exemption status, and that it is now amenable to taxation under the law of Florida." (*Bancroft Inv. Corp.* v. *City of Jacksonville,* on Rehearing, 27 So.2d 169, 171.)

Petitioners rely upon sections 987, 2190.1 and 4986.4 of the Revenue and Taxation Code as indicating the legislative intent to provide that property purchased under a contract of sale pursuant to the Veterans Farm and Home Purchase Act is assessable merely on a "possessory interest" basis. Sections 987 and 2190.1, enacted in 1945, relate to "a possessory interest in real estate of the Veterans Welfare Board" and section 987 specifies a formula for determining the cash value of the possessory interest of the contract purchaser from the Department of Veterans Affairs. But the Legislature cannot set aside the constitutional provision declaring that "[a]ll property . . . shall be taxed in proportion to its value" (Art. XIII, § 1) by requiring the assessment of property at less than its full cash value. Section 987, is, therefore, invalid as being in conflict with the constitutional provision. The reference in section 2190.1 of the Revenue and Taxation Code to the "possessory interest" must be disregarded for the same reasons. Section 4986.4 of the same code is a procedural statute applying to land which has been acquired by the Veterans Welfare Board, providing for the cancellation of prior taxes upon such land, but it makes no provision for taxes after the conditional sale contract has been made.

Petitioners also rely upon *Anderson-Cottonwood Irrigation Dist.* v. *Klukkert,* 13 Cal.2d 191 [88 P.2d 685], and *State Land*

*Settlement Board* v. *Henderson,* 197 Cal. 470 [241 P. 560]. In the first of them an irrigation district levied an assessment on certain land within the district and the assessment not having been paid, the lands were sold to the district. This court held that these lands, after their sale to the irrigation district, were not subject to county taxes for county government purposes, even though the lands were held for resale rather than for use for irrigation district purposes, on the ground that the "tax exemption provisions are directed solely to the 'ownership' of public property [and] the use to which such property is put becomes immaterial." (*Supra,* p. 194.) But the property involved in that case was held by the district absolutely with full and complete right to use and enjoy it and there was no conditional sale contract outstanding. In the second case, this court, by writ of mandate, compelled the cancellation of assessments in the name of the State Land Settlement Board against land which had been sold to individuals by that agency. (*State Land Settlement Board* v. *Henderson, supra.*) As to that property, the court quoted with approval from *San Pedro etc. R. R. Co.* v. *Los Angeles,* 180 Cal. 18 [179 P. 393], as follows: "When an interest in land, whether freehold or for years, is severed from the public domain and put into private hands, the natural implication is that it goes there with the ordinary incidents of private property and therefore is subject to be taxed." The earlier decision concerned the tax status of land leased to the railroad company, and as to such an interest, the court observed: "The principle that a possessory right in public land is private property, and that it may be assessed for purposes of taxation to the person in possession, although in point of law he may have no right as against the state or government owning the land, has long been settled in this state." But this statement, also quoted in reaching the conclusion that the real property to which the Land Settlement Board held title was not assessable to it, had no application to the facts then before the court, and even from a literal reading of that portion of the opinion, out of context, it is difficult to extract the principle, as have petitioners, that "the court held that the purchaser should be taxed only upon his possessory interest." The question presented for decision in the Land Settlement Board case did not concern the taxability to the purchaser of property sold by a state agency to an individual under an executory contract giving a present right to possession, and the statements in regard to the assessability of a lessee's interest

in real property are not in point in the present litigation. The decision did not establish a rule of property, but held that the state agency was not properly taxable on its reversionary interest, and the assessment and levy made against the state agency were ordered canceled.

The property here in controversy is properly assessable to the vendee in possession under an executory contract of sale. The alternative writ, therefore, is discharged and a peremptory writ of mandate is denied.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

SCHAUER, J.—I concur in the judgment and agree that the property is properly assessed to the conditional vendee, petitioner Eisley, and that the proceeding in mandamus is a proper vehicle for testing the claims here asserted.

It is my view, however, that whether or not the county assessor be regarded as a state officer the provisions of section 15 of article XIII of the California Constitution that ''No injunction or writ of mandate or other legal or equitable process shall ever issue in any suit, action or proceeding in any court against this State, or any officer thereof, to prevent or enjoin the collection of any tax levied under the provisions of this article; but after payment thereof action may be maintained to recover, with interest, in such manner as may be provided by law, any tax claimed to have been illegally collected,'' do not prohibit the issuance of mandamus here. It should be noted that in sections 1 through 10½, article XIII of the Constitution does provide for the levying of the tax involved.

Power to issue writs of mandamus is expressly confirmed in the courts of California by the state Constitution (Const., art. VI, §§ 4, 4b, 5), and statutory or other constitutional provisions which purport to deprive courts (or limit them in the exercise) of jurisdictional powers expressly confirmed in them by the Constitution are not to be extended by implication. The Legislature may not, ordinarily, even curtail constitutional jurisdiction or judicial powers. (*Miller & Lux* v. *Board of Supervisors* (1922), 189 Cal. 254, 274 [208 P. 304]; *In re Sutter-Butte By-Pass Assessment* (1923), 190 Cal. 532, 536 [213 P. 974]; *Gallagher* v. *Campodonico* (1931), 121 Cal.App.Supp. 765, 774 [5 P.2d 486]; 35 C.J.S. 778-779.)

And special-subject constitutional provisions which do limit general jurisdiction elsewhere in the Constitution expressly confirmed, or which purport to curtail inherent judicial powers, should not be construed to extend the special limitation beyond the clear import of the language used.

A similar federal statute (26 U.S.C.A. § 3653 (a), formerly R.S. 3224) provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." It will be noted that the quoted statute is in a degree broader than our constitutional limitation in that it is made expressly applicable to the "assessment" as well as to the "collection" of "any tax." It will also be remembered that generally speaking, federal statutes have force and effect on the jurisdiction of federal courts, other than the Supreme Court, equal to the force and effect of state constitutional provisions on the jurisdiction of state courts. As set forth in 35 Corpus Juris Secundum, page 777, et seq., "All federal courts, other than the supreme court, derive their jurisdiction wholly from the authority of congress; and, apart from such incidental powers as necessarily inhere in a lawfully created court, they have such jurisdiction only as, within constitutional limits, is conferred on them by acts of congress, either acts creating them or subsequent acts.

"Congress has power to prescribe and define the jurisdiction of inferior courts of the United States; and it may, in its discretion, give, grant, withhold, control, regulate, enlarge, limit, restrict, curtail, withdraw, or take away, the jurisdiction of such courts, even with respect to pending suits, provided it does not extend jurisdiction beyond constitutional limits, and provided, also, according to some authorities, it does not take away or abridge the inherent rights of ordained and established courts or limit judicial power, as distinguished from jurisdiction."

In respect to the operation of the limiting federal statute above quoted, American Law Reports (vol. 108, p. 201) declares the rule to be as follows: "The Federal statute [quoted hereinabove] . . . does not prohibit a suit in equity to restrain the collection of a tax where the tax is illegally exacted and where the taxpayer has no adequate remedy at law for its recovery if it is paid by him; and such remedy must be not only adequate, but also clear and unquestioned. [Citations.]

"The statute, being merely declaratory of the prior rule in equity, is not absolute; and it is inapplicable in extraor-

dinary and exceptional circumstances. The absence of a plain, adequate, and complete remedy at law, to pay the illegal tax and sue to recover it, raises an independent ground to support injunctive relief in equity. Such ancient equitable jurisdiction was not abrogated by the statute, which is construed in harmony with the former equitable doctrine. [Citations.] . . .

"[P. 205] The general rule in equity, irrespective of statute, is that where, in addition to the illegality of an exaction in the guise of a tax, there exist special and extraordinary circumstances sufficient to bring the case within some acknowledged head of equity jurisprudence, an injunction suit may be maintained. Where such circumstances exist, statutory provisions are rendered inapplicable unless specific language discloses beyond a doubt the purpose to abrogate the salutary and well-established rule of equity."

It seems important in appraising the reasoning which underlies the cases construing jurisdictional or procedural limitation statutes as being merely declaratory of the prior rule in equity to emphasize that such "prior rule in equity" is given effect so scrupulously that the rule itself often affords more protection to the State than could the statute. Under the equity rule, mere illegality of an assessment does not constitute a ground for the intervention of equity. (See 108 A.L.R. 186, 203-204, and cases there cited.) An unconstitutional tax will not be restrained unless other ground for equity intervention exists. (See *Bailey* v. *George* (1922), 259 U.S. 16 [42 S.Ct. 419, 66 L.Ed. 816] ; and cases collected at p. 192 of 108 A.L.R.) Even where the statute specifically recognizes a right to injunction when the tax sought to be enjoined is illegal, courts of equity will deny relief except in clear cases showing unmistakably that equitable grounds exist. (See 108 A.L.R. 201.) But where adequate grounds exist then the rule has been stated as follows: "If it be true, as contended by the defendant, that a tax may be collected, although it has been judicially determined to be illegal, the result will be that the taxing authorities are entirely above and beyond the law . . . [W]here there is no adequate remedy at law, the court should have power to grant relief; otherwise, the citizen will be more at the mercy of the departments of the national government than is consistent with life in a free country." (*Higgins Mfg. Co.* v. *Page* (1927; D. C.), 20 F.2d 948, 949.)

In *Miller* v. *Standard Nut Margarine Co.* (1931), 284 U.S. 498, 509-510 [52 S.Ct. 260, 76 L.Ed. 422], the United States Supreme Court stated its position on the matter in the following words: "Independently of, and in cases arising prior to, the enactment of the provision (Act of March 2, 1867, 14 Stat. 475) which became R.S., § 3224, this court in harmony with the rule generally followed in courts of equity held that a suit will not lie to restrain the collection of a tax upon the sole ground of its illegality. The principal reason is that, as courts are without authority to apportion or equalize taxes or make assessments, such suits would enable those liable for taxes in some amount to delay payment or possibly to escape their lawful burden and so to interfere with and thwart the collection of revenues for the support of the government. And this court likewise recognizes the rule that, in cases where complainant shows that in addition to the illegality of an exaction in the guise of a tax there exist special and extraordinary circumstances sufficient to bring the case within some acknowledged head of equity jurisprudence, a suit may be maintained to enjoin the collector. [Citations.] Section 3224 is declaratory of the principle first mentioned and is to be construed as near as may be in harmony with it and the reasons upon which it rests. [Citations.] The section does not refer specifically to the rule applicable to cases involving exceptional circumstances. The general words employed are not sufficient, and it would require specific language undoubtedly disclosing that purpose, to warrant the inference that Congress intended to abrogate that salutary and well established rule. This court has given effect to § 3224 in a number of cases. [Citations.] It has never held the rule to be absolute, but has repeatedly indicated that extraordinary and exceptional circumstances render its provisions inapplicable. [Citations.]" (See, also, *Hill* v. *Wallace* (1921), 259 U.S. 44, 62 [42 S.Ct. 453, 66 L.Ed. 822].)

Again, in the annotation in 84 American Law Reports, at page 1315, in reference to injunction being ordinarily an appropriate remedy, at least in the absence of a controlling statute, it is declared that "The rule has been stated without qualification in many cases, that injunction is a proper remedy against a tax on property which is by law exempt from taxation," citing *Osborn* v. *Bank of United States* (1824), 9 Wheat. 738 [6 L.Ed. 204]; *Tomlinson* v. *Branch* (1872), 15 Wall. 460 [21 L.Ed. 189]; *Allen* v. *Baltimore & O. R. Co.* (1884), 114

U.S. 311 [5 S.Ct. 925, 962, 29 L.Ed. 200]; *United States* v. *Rickert* (1903), 188 U.S. 432 [23 S.Ct. 478, 47 L.Ed. 532]; *Bailey* v. *Atlantic & P. R. Co.* (1874; C.C.), 3 Dill. 22, Fed. Cas. No. 732; and state court cases from Colorado, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, New York, North Carolina, Ohio, Pennsylvania, Texas, Virginia, and West Virginia. The note continues (p. 1316), ''There are numerous cases in which injunction has been sought to restrain the collection of taxes on property alleged to be exempt from taxation, which have been disposed of on the ground that the property was or was not exempt, or on some other ground, without adverting to the question of whether injunction was the proper remedy. No attempt has been made to collect such cases in this annotation, although they have a slight weight as inferential authority for the proposition that injunction is a proper remedy.'' Many California cases fall in this latter category.

In Pomeroy's Equity Jurisprudence (5th ed., vol. 1, pp. 529-534) it is said, ''In a large number of the states the rule has been settled in well-considered and often-repeated adjudications by courts of the highest character for ability and learning, that a suit in equity will be sustained when brought by any number of taxpayers joined as co-plaintiffs, or by one or more plaintiffs suing on behalf of all taxpayers similarly situated, or sometimes even by a single taxpayer suing on his own account, to enjoin the enforcement and collection, and to set aside and annul, any and every kind of tax or assessment laid by governmental authorities, either for general or special purposes, whether it be entirely personal in its nature and liability, or whether it be made a lien on the property of each taxpayer, whenever such tax is illegal. . . . In the face of every sort of objection urged against a judicial interference with the governmental and executive function of taxation, these courts have uniformly held that the legal remedy of the individual taxpayer against an illegal tax, either by action for damages, or perhaps by *certiorari,* was wholly inadequate; and that to restrict him to such imperfect remedy would, in most instances, be a substantial denial of justice, which conclusion is, in my opinion, unquestionably true. The courts have therefore sustained these equitable suits, and have granted the relief, and have uniformly placed their decision upon the inherent jurisdiction of equity to interfere for the prevention of a multiplicity of suits. The result has demon-

strated the fact that complete and final relief may be given to an entire community by means of one judicial decree, which would otherwise require an indefinite amount of separate litigation by individuals even if it were attainable by any means." It is also to be noted that Mr. Pomeroy (at p. 675) declares that "if recognized equitable grounds for exercising jurisdiction appear, the federal courts, in the exercise of their equity jurisdiction, are not bound by state statutes which forbid the issuance of injunctions to prevent the collection of taxes." To the same effect, see note, 108 American Law Reports, page 218.

It is in the light of the above noted general rules that we should examine the exact language of our constitutional provision. Immediately it becomes apparent that our limitation, in that it relates solely to *collection* of a levied tax, is not so broad as the federal statute, and, given full effect but not extension, admits of such control of the assessment procedures as is necessary for the entertainment and disposition of the subject case. It reads: "No injunction or writ of mandate or other legal or equitable process shall ever issue in any suit, action or proceeding in any court against this State, or any officer thereof, *to prevent or enjoin the collection* of any tax levied under the provisions of this article; but after payment thereof action may be maintained to recover, with interest, in such manner as may be provided by law, any tax claimed to have been illegally collected." (Italics added.) It seems not insignificant that the special circumscription of powers is limited to process "to prevent or enjoin the *collection* of any tax *levied*," etc. In other words, this court possesses general jurisdiction to issue mandate; that jurisdiction endures in relation to this and similar cases except as it, or judicial power in the exercise thereof, may be specifically limited by the language above quoted. The limitation at most is only on its jurisdiction or power to issue its process "to prevent or enjoin the *collection* of any tax *levied*." In *Briscoe* v. *McMillan* (1907), 117 Tenn. 115 [100 S.W. 111], the Supreme Court of Tennessee dealt with a similar problem. It said (p. 114 of 100 S.W.),

"The first question we shall notice, arising on the demurrer, goes to the jurisdiction of the court. It is insisted on behalf of the defendants that the present bill is in effect a suit against the state, and is in contravention of section 1064 et seq. of Shannon's Code, embodying the act of 1873, to the effect that no preventive writ of any kind shall be granted by any

court to prohibit, or to hinder or delay, the collection of any revenue claimed by the state; but, if the taxpayer considers the tax 'unjust or illegal or against any statute or clause of the Constitution,' he must pay the same under protest and may then within 30 days sue the collecting officer to recover it back.

"Section 1063 further provides that there shall be no other remedy 'in any case of the collection of revenue or attempt to collect revenue illegally.'

"We are of opinion the sections of the Code invoked herein are inapplicable in the present case. The statute in question by its express provisions only applies to the collection of taxes. There is no effort here to prevent the collection of taxes, but the object of the bill is to enjoin the state board of equalization against the alleged illegal exercise of its jurisdiction in the assessment of said county and municipal taxes."

In California that there is substantial distinction between the assessment process and the collection procedures has heretofore seemed obvious; indeed, traditionally in this state the offices and functions of assessor and tax collector have been separate. (Pol. Code. §§ 4013, 4017, 4125, 4126.)

The purpose of the litigation in this case is to ''compel the county assessor to assess to Eisley his *possessory interest* in real property purchased by him from the Veterans Welfare Board." (Italics added.) Even if this court does not see fit to follow the federal rule of construction, hereinbefore set forth, nevertheless this proceeding can be maintained and its pendency not interfere with the *collection* of any tax already assessed and *levied*. To make the collection, when a tax has been assessed and levied, various steps are provided to be taken by the taxing authorities. (See generally, Rev. & Tax. Code, §§ 2501-3112.) I perceive in section 15 of the Constitution no divestiture of jurisdiction or abrogation of judicial power of the courts of this state to entertain mandamus looking toward requiring any taxing officer or body, in making an assessment, to comply with the law, or, in case of an illegal assessment, to comply with the mandatory provisions of applicable statutes. (See Rev. & Tax. Code, pt. 9, div. 1.) If a taxing authority should arbitrarily refuse to perform its duty—to levy any taxes whatsoever—would not mandamus be the appropriate remedy to compel the performance of official duty? And would not such official duty consist in assessing a tax in accordance with law? Is not the performance of that duty exactly what the petitioner here assertedly de-

mands? If the court has power to compel the performance of official duty does it not necessarily have the power to determine, within limits, the acts which would constitute "official duty"?

In *McClelland* v. *Board of Supervisors* (May, 1947), 30 Cal. 2d 124, 129-130 [180 P.2d 676], we held that "Where, as here, it is substantially contended that fraud or 'something equivalent to fraud' results from arbitrary action of the board in declining to equalize the assessed valuations of property, the proceedings before the board are subject to review." See also cases there cited. Certiorari to annul the action of a board of equalization in respect to determining values for assessment purposes certainly comes as close to "process . . . to prevent or enjoin the collection of any tax levied under the provisions of" article XIII as does mandamus to compel assessment of property to a certain person or to compel allowance of a constitutional exemption in making an assessment. But again, technically, the process is not issued to "prevent or enjoin the *collection*" of a levied tax. Any levied tax may be collected, during the pendency of the mandamus or certiorari proceeding or at any time as the law may provide (in the McClelland case it appeared that the tax was paid during the pendency of the proceedings), but in the meantime the taxpayer is pursuing the extraordinary remedy which may be the only substantially adequate and convenient remedy available to him. It may be the only means by which the pertinent statutory provisions can be practically enforced. The prompt determination of correct assessment procedure may well be even more important to the state than to the suing taxpayers themselves. I therefore would hold this proceeding to be without the scope of section 15 of article XIII whether or not the assessor be regarded as a state officer.

I think the orderly processes of government and the expeditious and economical assessment and resulting collection of taxes are more likely to be thwarted than served by any broader application of the section, and that this court should take such a position and make it known for the guidance of other taxing authorities and taxpayers. It seems sounder procedure to me, and better constitutional law, to follow the general rule of the federal (and many other) jurisdictions, as we tacitly have been doing, or at least to hold the limitation to the scope of its own language, to give it effect to the extent of the clear import of its language but no further, and to maintain the extraordinary remedies as available, when otherwise

proper, for the prompt determination of assessment problems. We can do this, as above suggested, in respect to assessment procedure, without issuing the process "to prevent or enjoin the collection of any tax levied under the provisions of" article XIII, and by so doing we can expeditiously require assessing authorities and other state as well as county officers to perform their official duties in accord with law. The fact that a decision we may render in respect to assessment procedure may cause a tax to be levied different from that threatened or may ultimately form the basis for repayment of a tax paid does not bring us into conflict with the limitation against enjoining or preventing the collection of a levied tax. Even though mandamus may ultimately cause the cancellation of an illegal assessment it need not prevent or enjoin any *collection process* in respect to a tax levied as a result of the illegal assessment. If mandamus is eventually denied the assessment stands and, the collection of the tax not having been prevented, obviously the constitutional limitation has not been breached. If mandamus is finally granted, a legal assessment made and the illegal assessment cancelled, then payments made pursuant to the illegal assessment may be refunded in accordance with applicable law. (See Rev. & Tax. Code, div. 1, pt. 9, ch. 5, art. 1.)

It is important to note that the Revenue and Taxation Code, as above indicated, expressly provides for situations in which it becomes the duty of public officers to cancel an uncollected tax. Section 4986 declares that "All or any portion of any uncollected tax, penalty, or costs, heretofore or hereafter levied, may, on satisfactory proof, be cancelled by the auditor on order of the board of supervisors with the written consent of the district attorney if it was levied or charged . . . (b) Erroneously or illegally." Section 4986.4 provides for the cancellation of taxes "Whenever any property has been deeded to the Veterans' Welfare Board pursuant to Division 4 of the Military and Veterans Code." Section 4991, in mandatory language, ordains that "If the tax collector erroneously sells or deeds to the State property for the taxes which were a lien on the property for any year and the taxes for that year have been paid or were not legally a lien on the property, the auditor and the tax collector shall certify the facts to the board of supervisors. The board of supervisors shall then order: (a) The county recorder to cancel the erroneous certificate or deed. (b) The auditor to cancel the sale and enter the fact and date of the cancellation on the margin of the

delinquent roll opposite the description of the property." We should also observe that section 4990 mandatorily provides for cancellation in the event of dual assessment: "On discovery that any property is assessed by the same taxing agency more than once for the same year, after payment of all charges justly due on the property the person having custody of the rolls shall certify the facts to the board of supervisors. The board of supervisors shall then order the auditor to cancel the other charges and assessments by an entry on the margin of the roll and, if carried there, the delinquent and current roll."

Availability of the extraordinary writs may well prevent a multiplicity of suits and furnish a prompt and solely adequate remedy. A man who did not possess the money to pay a tax and thereby qualify to sue for its refund, could let his property be sold to the state pursuant to the collection process, but, by prevailing in mandamus to compel the assessor or auditor or supervisors to perform official duty, could establish the basis for cancellation of the sale under the mentioned provisions of the Revenue and Taxation Code. The use of mandamus to compel the performance of official duty in substantially similar cases is not new in California. (See *People v. Board of Supervisors* (1932), 126 Cal.App. 670, 672, 674 [15 P.2d 209] (mandamus to compel board of supervisors to cancel taxes); *State Land Settlement Board* v. *Henderson* (1925), 197 Cal. 470 [241 P. 560] (to compel cancellation of tax liens); see also *Anderson-Cottonwood Irrigation Dist.* v. *Klukkert* (1939), 13 Cal.2d 191 [88 P.2d 685] (to prohibit assessment); *Glenn-Colusa Irrigation District* v. *Ohrt* (1939), 31 Cal.App.2d 619 [88 P.2d 763] (mandamus to compel board of supervisors to cancel an assessment of taxes).)

For the reasons above delineated I would hold that section 15 of article XIII of the California Constitution does not divest this court of jurisdiction or judicial power to issue mandate, in cases otherwise proper, to compel performance of official duty, including the making of assessments in the manner and the amounts provided by law, whether the taxing authority be regarded as a state officer or as a county officer.

Carter, J., concurred.

Petitioners' application for a rehearing was denied April 29, 1948. Carter, J., and Schauer, J., voted for a rehearing.